|  |  |
|---|---|
|  | UNITED STATES DISTRICT COURT<br>SOUTHERN DISTRICT OF FLORIDA<br><br>CASE NO. 06-60178-Civ-COHN<br>MAGISTRATE P. A. WHITE |
| EARL HUGHES BURGEST,      : |  |
|     Plaintiff,   : |  |
| v.                       : | REPORT OF<br>MAGISTRATE JUDGE |
| UNITED STATES, et al.,   : |  |
|     Defendants.   : |  |

## I.   INTRODUCTION

In this case, the plaintiff Earl Hughes Burgest's pro se civil rights complaint pursuant to 42 U.S.C. §1983, as amended (DE# 21), is pending against one defendant, Brenda West, a corrections deputy employed by the Broward Sheriff's Office ("BSO") at the Broward County Main Jail ("BCMJ"). (See Report DE# 24; and Order DE# 30).

The gravamen of Burgest's pleading is his claim that West abridged his privacy rights. He alleges that, on or about December 13, 2005, West allegedly disclosed to other BCMJ inmates that Burgest is HIV positive. Burgest's stated basis for believing and alleging that West did this is his allegation that on 12/13/05 BCMJ inmate Eric Bivens called him out of his cell, and then in Burgest's and West's presence accused West of having told inmates on Units 6A1 and 6A2 that Burgest is HIV positive, and that he was dying of AIDS. Burgest states that West screamed at inmate Bivens to go to his cell, and further states that he (Burgest) then asked West for an inmate grievance form with which to complain about the matter. West mistakenly gave Burgest an inmate "request" form, which he completed and returned to officer Carson. Carson told Burgest that it was the wrong form, and gave him a "grievance form," which he completed and returned to Carson for processing on the same day (12/13/05). Burgest also alleges that, on an undisclosed earlier date, West had been working as security officer while a nurse was issuing inmate medications, and West had commented upon seeing Hughes' medications in his hands, "Gosh! Those are some big pills." **This Cause is before the Court upon West's Motion for Summary Judgment (DE# 57-1) with multiple**

**exhibits (DE#s 57-2 to 57-5),** to which Burgest was informed of his right to Respond.[1]  In opposition to West's motion, Burgest then filed a Response (DE# 68) with attached exhibits (DE# 68 at pp. 32-46), which include Burgest's sworn Declaration (Ex.A, Id., at pp. 32-38). In his Response (DE# 68), Burgest also incorporates by reference, copies of Inmate Grievance forms, and Responses, which he had attached to his Amended Complaint [see DE# 21, at pp. 11-22].  In answer to Burgest's Response, the defendant West filed a

---

[1]  Rule 56(c)of the Federal Rules of Civil Procedure provides that summary judgment is proper

> [i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c).

In Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the Court held that summary judgment should be entered only against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.  The moving party is 'entitled to judgment as a matter of law' because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. (citations omitted). Thus, pursuant to Celotex and its progeny, a movant for summary judgment bears the initial responsibility of informing the court of the basis for his motion by identifying those parts of the record that demonstrate the nonexistence of a genuine issue of material fact. This demonstration need not be accompanied by affidavits. Hoffman v. Allied Corp., 912 F.2d 1379, 1382 (11 Cir. 1990).If the party seeking summary judgment meets the initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party, to come forward with sufficient evidence to rebut this showing with affidavits or other relevant and admissible evidence. Avirgan v. Hull, 932 F.2d 1572, 1577 (11 Cir.), cert. denied, 112 S.Ct. 913 (1992). It is the nonmoving party's burden to come forward with evidence on each essential element of his claim sufficient to sustain a jury verdict. Earley v. Champion International Corp., 907 F.2d 1077, 1080 (11 Cir.1990). The non-moving party cannot rely solely on his complaint and other initial pleadings to contest a motion for summary judgment supported by evidentiary material, but must respond with affidavits, depositions, or otherwise to show that there are material issues of fact which require a trial Fed.R.Civ.P. 56(e); Coleman v. Smith, 828 F.2d 714, 717 (11 Cir. 1987). If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); Baldwin County, Alabama v. Purcell Corp., 971 F.2d 1558 (11 Cir. 1992). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11 Cir. 1990) (citing Anderson v. Liberty Lobby, Inc., supra).

The Order of Instructions (DE# 58) informed Burgest, as a *pro se* litigant, of his right to respond to West's Motion for Summary Judgment, and instructed him about the requirements under Fed.R.Civ.P. 56 for response to such a motion.

Reply (DE# 70).

## II.   Discussion

Through her Motion and Reply West claims entitlement to disposition of Burgest's amended pleading, in her favor, on two grounds.

First, West argues that Burgest's pleading is barred since, before filing suit in federal court, he did not fully exhaust his available administrative remedies, as required by the exhaustion provision of the Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. §1997e(a).

Second, West argues that the record does not support the finding of a constitutional violation, and that she is entitled to qualified immunity. This is because the allegation in Burgest's complaint [that West told other inmates about his HIV status], and his Affidavit on summary judgment repeating that allegation, contain nothing more than hearsay testimony; and moreover, because even if, *arguendo,* she had done what is claimed, the law was not clearly established in 2005 that the alleged conduct, if committed, would constitute a violation of Burgest's constitutional rights.

### 1.   **EXHAUSTION**

#### a.   **The Law**

The PLRA, as enacted on April 26, 1996, significantly altered a prisoner's right to bring civil actions *in forma pauperis*. Among other things, the PLRA placed new restrictions on an inmate's ability to seek federal redress concerning jail/prison conditions (conditions of confinement). Subsection (a) of 42 U.S.C. §1997e reads, as follows:

> (a) Applicability of administrative remedies
>
> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such

3

>     administrative remedies as are available are
>     exhausted.

The Courts have held that satisfaction of the PLRA exhaustion requirement serves as a threshold issue, since the statutory mandate requires an inmate/prisoner to have fully exhausted the administrative remedies/processes which are available to him or her, before bringing suit on a claim in federal court, regardless of the form of relief that the administrative process makes available. See Booth v. Churner, 532 U.S. 731, 736-41 (2001); Higginbottom v. Carter, 223 F.3d 1259 (11 Cir. 2000); Miller v. Tanner, 196 F.3d 1190, 1193 (11 Cir. 1999); Harris v. Garner, 190 F.3d 1279, 1286 (11 Cir. 1999); Harper v. Jenkin, 179 F.3d 1311, 1312 (11 Cir. 1999); Alexander v. Hawk, 159 F.3d 1321, 1325-26 (11 Cir. 1998).

The Eleventh Circuit has held that "judicially recognized futility and inadequacy exceptions do not survive the new mandatory exhaustion requirement of the PLRA," Alexander v. Hawk, supra, 159 F.3d at 1325-26; Harris v. Garner, 190 F.3d 1279, 1286 (11 Cir. 1999). Where exhaustion is now a precondition to suit "the courts cannot simply waive those requirements where they determine that they are futile or inadequate" since "such an interpretation would impose an enormous loophole in the PLRA which Congress clearly did not intend,"[2] and because "[m]andatory exhaustion is not satisfied by a judicial conclusion that the requirement need not apply," Alexander, supra, at 1326 [citing, Weinberger v. Salfi, 422 U.S. 749, 766 (1975) (holding that where exhaustion is a statutorily specified jurisdictional prerequisite, "the requirement...may not be dispensed with merely by a judicial conclusion of futility")].

---

[2] The current exhaustion requirement under §1997e(a) was designed to reduce the quantity and improve the quality of prisoner suits, and affords corrections officials an opportunity to address complaints internally before allowing the initiation of a federal case; and in some instances, corrective action taken in response to a grievance might improve prison administration and satisfy the inmate, thereby obviating the need for litigation. Porter v. Nussle, 534 U.S. 516, 516-17 (2002). In other instances, the internal review might filter out some frivolous claims; and for cases ultimately brought to court, an administrative record clarifying the controversy's contours could facilitate adjudication. Id. at 517.

Cf. Qawi v. Stegall, et al., 211 F.3d 1270 [table case, published on Westlaw], No. 98-1402, 2000 WL 571919, at *1-2 (6 Cir. (Mich) May 3, 2000) (affirming dismissal of complaint for lack of exhaustion, and noting that it was appropriate even though by time of the appeal the plaintiff's administrative remedies might have become time-barred) (citing Hartsfield v. Vidor, 199 F.3d 305, 309 (6 Cir. 1999); and Wright v. Morris, 111 F.3d 414, 417, n.3 (6 Cir. 1997)).

Section 1997e(a) requires that an inmate must have taken the appropriate *procedural steps* and must have exhausted the available *administrative processes* before bringing suit in federal court. Booth v. Churner, 532 U.S. 731, 736-41 (2001) (holding that "one 'exhausts' processes, not forms of relief,[3] and the statute provides that one must"; and further holding that "we think that Congress had mandated exhaustion clearly enough, regardless of the relief offered through administrative procedures"); Miller v. Tanner, 196 F.3d 1190, 1193 (11 Cir. 1999) (incarcerated state prisoner must first comply with the grievance procedures established by the state department of corrections before filing a federal lawsuit under section 1983); Harper v. Jenkin, 179 F.3d 1311, 1312 (11 Cir. 1999) (rejecting plaintiff's argument that his administrative remedies should be deemed exhausted since his grievance was denied as untimely and any appeal therefrom would necessarily be denied; and affirming dismissal of civil rights suit for failure to satisfy mandatory exhaustion requirements, and in doing so holding that the appellant could not be considered to have exhausted his administrative remedies where he had not sought leave to file an out-of-time grievance, since to find otherwise would allow an appellant to simply ignore the PLRA's exhaustion requirement and still gain

---

[3] The term "available," as used in Section 1997e(a), does not mean that prison inmates must only exhaust their administrative remedies if the type of relief they seek is "available" within the administrative apparatus; instead, the term means that a prisoner must exhaust all administrative remedies that are available before filing suit, regardless of their adequacy. Alexander, supra at 1325-26; Harris, supra at 1286. Thus, an inmate seeking money damages as relief from defendants in a lawsuit must exhaust all his administrative remedies before filing suit, even if money damages are not available as relief through the jail/prison grievance procedure. Booth, supra, 532 U.S. at 741, n.6; Alexander, supra.

access to federal court merely by filing an untimely grievance).

Thus, the law is clear in this Circuit that inmates/prisoners must have fully exhausted their available administrative remedies, and if they have missed a deadline (for grieving or appealing) that is established as part of an inmate grievance procedure, they must have sought to file out-of-time grievances and/or grievance appeals in order to exhaust their administrative remedies, as required under the PLRA. A prisoner who has not sought leave to file an out-of-time grievance cannot be considered to have exhausted his administrative remedies under §1997e(a), see Harper v. Jenkin, supra, 179 F.3d at 1312; and even if an appeal would have been futile, the requirement that it be filed is not waived. See Alexander v. Hawk, supra 159 F.3d at 1325-26.

### b. Analysis

In this case, Defendant West has proffered a copy of the BSO inmate grievance procedure, and she asserts that to comply with §1997e(a) and cases construing it, plaintiff was required to have exhausted that grievance procedure at all levels. The BSO grievance procedure is a 4-level process, beginning with the voicing of concerns verbally at two levels (first with the housing deputy or medical staff; and thereafter with the Unit Sergeant or Officer in Charge). Then, if the matter cannot be resolved, the detainee, within 5 days of the incident, is to complete and submit an *Inmate Grievance Form.* The procedure provides that staff from the facility commander's office are to issue a response within 10 business days. Thereafter, if dissatisfied, the inmate must "file an appeal directly with the facility commander by filling out the appropriate section of the form," and submitting it. Response to the appeal, or an explanation why more time is needed for said response, is to be sent to the detainee within 20 business days; and the facility commander is then to respond when a response may be reasonably expected. The written instructions for the Grievance Procedure lists the phone number for the "Ombudsman Line," but specifically provides that: "This should **only** be used after the grievance process has been exhausted..." (See Ex.C, at DE# 57-5).

6

The record shows that plaintiff Burgest's 12/13/05 grievance (DE# 21, at p. 11) was not responded to within ten days. His summary judgment response, and documents from his amended pleading [which he has incorporated by reference] establish that starting on 12/25/05, Burgest filed six more grievances (dated 12/25 and 12/26/05; ½, 1/6, 1/9, and 1/10/06 -- see Grievance Forms at DE# 21, pp.12-18 -- most complaining not about West's alleged privacy deprivation itself but rather about failure of BCMJ staff to respond to the 12/13 grievance). Burgest's documentation also shows that, finally, in reaction to the 1/10/06 grievance, he received a Response (Id. at p.18) with an attachment dated 1/23/03 (Id., at p.19) providing a detailed Response to the allegations of his 12/13/05 Grievance against West, deeming them to be unfounded. This Response to the allegations of his 12/13/05 Grievance, albeit delayed, triggered the requirement for Burgest to Appeal if he was dissatisfied with the response. He did not appeal.

Burgest, faced with the possibility of a dismissal pursuant to §1997e(a), argues that, ultimately, an eighth grievance by him dated 1/30/06 (DE# 21, p.20) was answered by the Ombudsman on 1/30/06 (DE# 21, p.21). Burgest states that he "assumed" this constituted a "final resolution" of his grievance. He reasons that this should be so, because the Ombudsman's response "was resolved by an official from the commander's office other than Defendant West's immediate supervisor, Sergeant Scott." He further argues that he was not given a copy of the inmate grievance procedure. These arguments and Burgest's reasoning, however, overlook the fact that the very form (DE# 21, p.18) on which the 1/23/06 Response to the substance of his 12/13/05 claims against Officer West was provided [finding them "unfounded"], bore in capital letters a clear instruction for initiating an appeal from the response. (On the bottom half of the Grievance form [DE# 21, p.18], below the section captioned "PART B - RESPONSE," is a further section with the caption "TO BE COMPLETED IF INMATE WANTS TO APPEAL RESPONSE." Immediately below that are the words "I wish to appeal the response" and spaces for the Inmate's signature and the date of signature). Yet further below on the grievance form is still

another section captioned "FACILITY ADMINISTRATOR'S RESPONSE TO APPEAL." Burgest therefore cannot reasonably contend that he was not advised that he could appeal from the 1/23/06 grievance response. Rather than signing and dating the grievance form in the appropriate spaces, so as to put the BCMJ Administrator on notice that he was appealing, Burgest instead proceeded to file yet another grievance (the one dated 1/30/05, which the Ombudsman answered). Even if, assuming *arguendo*, Burgess had not yet received his copy of the 1/23/05 Response before he filed the 1/30 grievance, that does not excuse him from failing to exercise his appeal by going back and filling in the appropriate spaces for doing so on the bottom of the 1/23 Response.

It is clear that, before filing suit in federal court, Burgest did not fully exhaust all steps of his available administrative remedies (i.e., the various steps of the BSO inmate grievance procedure). Notwithstanding Burgest's arguments that the 1/30/06 "Ombudsman Report" should be deemed to have superseded the need for an appeal, it appears to be clear from the face of the Obmudsman's Report that it was in response to Grievances, not to an Appeal, and clear that Burgest's administrative remedies were not exhausted. It is apparent that, under these circumstances, the complaint, as amended, against defendant West, is subject to dismissal pursuant to 42 U.S.C. §1997e(a).

In the alternative, for reasons discussed below in Section "II.2." of this Report, it appears that the amended complaint against defendant West should be summarily dismissed in her favor, based on her argument that the record does not support a finding that there was a constitutional violation, and her argument that she is entitled to qualified immunity.

### 2. Failure to State a Claim/Qualified Immunity

In her motion, West notes that at deposition (DE# 57-4, Ex.B, T/26) Burgest was questioned about his allegation that on an un-disclosed date West had been present when his medications were being passed out, and had commented that his pills were large in

size. Although this incident was earlier framed as being the basis for a §1983 claim, it is unclear how such an utterance could constitute a privacy violation, as the allegation does not indicate that that statement, if made, included any comment about Burgest's HIV status, or that it was uttered in the presence of other inmates or non-medical personnel not already privy to Burgest's condition. Moreover, Burgest, at deposition, stated with regard to the alleged incident, that it "wasn't nothing." This suggests that the incident was not intended by Burgest to form the basis for a discrete claim in this case.

As for the central claim against West, i.e., that on 12/13/05 inmate Bivens said that West had disclosed existence of Burgest's medical condition to inmates on two units of the jail, West correctly observes that Burgest, apart from repetition of hearsay (inmate Bivens' utterance on 12/13/05) there is no proof of record to establish the occurrence of the alleged violation.  It is not necessary to reach a determination on the merits based on that argument, however, because Defendant West raises the separate argument that even if she had done what Burgest claims, she would be entitled to disposition of the claim in her favor based on qualified immunity, since the law was not clearly established in 2005 that such a disclosure would constitute a violation of the inmate's constitutional rights.

When government officials act in a way that knowingly violates a person's clearly established statutory or constitutional rights, they are not immune from suit and may be held liable for the damages their actions have caused. <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818-19 (1982). However, when those same officials make decisions that do not knowingly violate such rights, they are "immune" from suit, and are not required to defend themselves in an action for damages. <u>Id</u>.  This defense (which in this case is relied upon by the defendant West), is called "qualified immunity," because the official is immune from a damage lawsuit, qualified upon his ability to show that he did not knowingly violate the plaintiff's clearly established right.  <u>Id.</u>

In asserting this qualified immunity defense, it is not defendant's West's contention that under no circumstance does an incarcerated person retain any privacy rights,[4] but rather that the law of privacy in the jail/prison context was not sufficiently developed at the time of the events alleged, to put West on notice that the kind of action for which he is sued would, under the circumstances, constitute a deprivation of plaintiff Presley's constitutional rights.

Qualified immunity insulates governmental officials from the burdens of civil trials and from personal liability for actions taken pursuant to their discretionary authority. Saucier v. Katz, 533 U.S. 194 (2001); Harlow v. Fitzgerald, 457 U.S. 800 (1982); Flores v. Satz, 137 F.3d 1275 (11 Cir. 1998); Foy v. Holston, 94 F.3d 1528 (11 Cir. 1996); McMillian v. Johnson, 88 F.3d 1554, 1562, amended on other grounds, 101 F.3d 1363 (11 Cir. 1996). The test for courts to use in determining whether an official is protected by qualified immunity is whether the official's conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800 (1982). The usual rule is that qualified immunity protects government actors, and "only in exceptional cases will government actors have no shield against claims made against them in their individual capacities." Foy v. Holston, 94 F.3d 1528, 1532 (11 Cir. 1996) (quoting Lassiter v. Alabama A & M Univ., 28 F.3d 1146, 1149 (11 Cir. 1994). Once the qualified immunity defense is raised by a

---

[4] Prisoners retain constitutional rights, though courts have balanced them against governmental interests and diminished them where necessary to maintain institutional objectives. See Bell v. Wolfish, 441 U.S. 520, 545-46; Wolff v. McDonnell, 418 U.S. 539, 555-56 (1974). Prison inmates retain certain fundamental rights of privacy, see Houchins v. KQED, Inc., 438 U.S. 1, 5 n. 2 (1978)(Inmates "are not like animals in a zoo to be filmed and photographed at will by the public or by media reporters, however 'educational' the process may be for others."). Thus, a prisoner's privacy rights may, under appropriate circumstances, be subject to reasonable restrictions or limitations when there is a valid, rational connection between the regulation or limitation, and some legitimate government interest, such as the maintenance of security, order and discipline. See Turner v. Safley, 482 U.S. 78, 89 (1987). See also Fortner v. Thomas, 983 F.2d 1024 (11 Cir. 1993) (bodily privacy); Michhenfelder v. Sumner, 860 F.2d 328, 333-34 (9 Cir. 1988).

10

defendant, a plaintiff bears the burden of showing that the federal rights allegedly violated were clearly established, and this burden is not easily discharged. Foy, supra, at 1532. Plaintiffs cannot carry their burden of proving the law to be clearly established by stating constitutional rights in general terms. Id. Rather, if qualified immunity is to be denied, "pre-existing law must dictate, that is, truly compel...the conclusion for every like situated, reasonable government agent that what defendant is doing violates federal law in the circumstances..." Lassiter, supra, at 1150.

In this case, defendant West argues that she is entitled to qualified immunity because at the time of the event alleged, there was not "clearly established" law in the area of inmate privacy rights, which would have put her on notice that her action [alleged disclosure of inmate/plaintiff Burgest's HIV status to other detainees] would constitute an abridgement of plaintiff Burgest's federal constitutional rights.

When determining whether the defendant West in this case may be entitled to qualified immunity, there is an initial two-part inquiry which must be undertaken and resolved. That preliminary inquiry necessarily involves two questions: 1) whether the defendant acted within the scope of his discretionary authority; and 2) whether the defendant's actions violated clearly established law. See Caraballo-Sandoval v. Honsted, 35 F.3d 521, 524 (11 Cir. 1994).

Only if both prongs of the two-part inquiry were satisfied, would the court's analysis proceed to a next step, involving a balancing of the factors enunciated in Turner v. Safley, 482 U.S. 78 (1987)[5] to determine whether valid state interests outweigh a

---

[5] The Turner Court identified several factors that serve to channel the reasonableness inquiry: (1) whether there is a "valid, rational connection" between the regulation and a legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the asserted constitutional right that remain open to the inmates; (3) whether and the extent to which accommodation of the asserted right will have an impact on prison staff, inmates, and the allocation of prison resources generally; and (4) whether the regulation represents an "exaggerated response" to prison concerns. Turner, 482 U.S. at 89-91; Harris v. Thigpen, 941 F.2d 1495, 1516 (11th Cir.1991).

retained constitutional right.

Here, the evidence shows that defendant West was acting within the sphere of her official responsibilities. It is apparent that West was acting within the scope of her discretionary authority.

The next question is whether at the time of the alleged incident, the law was clearly established, so that it could be said that the preexisting law would have put any reasonable government actor, including defendant West, on notice that doing what defendant [West] allegedly did would violate federal law in the circumstances. See Lassiter, supra, at 1150.

The Court of Appeals for the Eleventh Circuit has held that in this Circuit the law can be "clearly established" for qualified immunity purposes, "only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose." Jenkins v. Talladega City Bd. of Education, 115 F.3d 821, 826-27 n. 4 (11 Cir. 1997) (en banc).

As noted supra, the general area of the law in this case involves privacy rights.

Having recognized the existence of privacy rights which flow from the Constitution, the federal courts have balanced such rights against governmental needs limiting them. See, e.g. Whalen v. Roe, 429 U.S. 589 (1977); Nixon v. Administrator of General Services, 433 U.S. 425 (1977).

While no "right of privacy" is expressly guaranteed in the Constitution, the Supreme Court recognized that specific constitutional guarantees may create "zones of privacy." See Paul v. Davis, 424 U.S. 693, 712-13 (1976). Thereafter, the Court noted that a privacy right under the fourteenth amendment exists in "the individual interest in avoiding disclosure of personal matters." Whalen v. Roe, 429 U.S. 589, 599-03 (1977) (finding that the right to privacy encompasses two distinct areas: avoiding disclose of personal matters, and independence in making important decisions,

but holding that a state statute authorizing the state to record certain personal information did not violate this privacy right). In making its findings and reaching its holdings, the Court in Whalen, however, explicitly reserved the question whether the "unwarranted disclosure of accumulated private data" by the state would violate the Constitution, Id., at 605-06, and thus left the question for further interpretation.

As discussed further, below, computer assisted research reveals no subsequent U.S. Supreme Court decision, or decisions by the United States Court of Appeals for the Eleventh Circuit or the Florida Supreme Court, which clearly define the prisoner privacy right in question in this case ( i.e., whether disclosure by a corrections officer of one inmate's medical information [HIV status], constitutes a violation of the inmate/plaintiff's retained right of privacy.

In 1999, the Second Circuit reached the questions whether an HIV positive inmate, who before incarceration underwent a sex change operation, had a privacy right to maintain confidentiality of her HIV status and transsexualism. Powell v. Schriver, 175 F.3d 107, 113-15 (2 Cir.1999). Since Powell is a Second Circuit decision, it cannot be considered when deciding in this case if the law was "clearly established" for purposes of determining qualified immunity.[6]

Other Courts have held, in other contexts, in non-prisoner cases, that the right of privacy protects against the unauthorized disclosure of personal matters, including personal medical informa-

---

[6] In Powell, a Correction Officer, who was escorting the inmate/plaintiff to the prison's medical facility, commented to other officers in the presence of other inmates that the plaintiff was HIV positive and transsexual. The disclosure occurred in 1991. The Powell Court, finding that although the general right to maintain confidentiality of medical information was decided by the Second Circuit in 1994, see Doe v. City of New York, 15 F.3d 264, 267 (2 Cir. 1994), that case was outside of the prison context; and the Powell Court concluded, in the absence of any other appellate holdings which were binding on the Second Circuit, that the inmate/plaintiff's right to maintain confidentiality of her HIV status and transsexualism was not clearly established at the time of the disclosure in 1991, and the defendant/appellee was therefore entitled to qualified immunity.

13

tion or personal medical records. See Doe v. City of New York, 15 F.3d 264, 267 (2 Cir. 1994) (recognizing the right to be free from unauthorized disclosure of medical records); Schaill ex rel. Kross v. Tippecanoe Co. Sch. Corp., 864 F.2d 1309, 1322 n. 19 (7 Cir. 1988) (recognizing, in a case involving a random urine testing program for athletes and cheerleaders, that the students had a substantial privacy interest in the confidentiality of medical information, but refusing to invalidate the program in the absence of any indication that confidential medical information would be widely disseminated, where the need for disclosure arose only in the event of a positive urine test, and positive results would be disclosed only to the athletic director).

In the prison context, it is established that inmates do not forfeit all constitutional protections by reason of their confinement, see Bell v. Wolfish, 441 U.S. 520 (1979); Turner v. Safley, 482 U.S. 78 (1987) (applying a four-part "Reasonableness" inquiry); and the Eleventh Circuit has recognized that prisoners "retain certain fundamental rights of privacy," Harris v. Thigpen, 941 F.2d 1495, 1513 (11 Cir. 1991) (quoting Houchins v. KQED, Inc., 438 U.S. 1, 5 n. 2 (1978); Fortner v. Thomas, 983 F.2d 1024, 1029 (11 Cir. 1993) (citing Harris and Houchins, supra).

The Eleventh Circuit in both Harris and Fortner, however, while quoting Houchins for the principle that prisoners retain certain privacy rights, explicitly observed that the exact nature of prisoners' retained right to privacy is not well defined. Harris v. Thigpen, supra, at 1513 ("the precise nature and scope of the privacy right at issue is rather ill-defined"); Fortner, supra, 983 F.2d at 1030 (noting: "As stated previously, this Court has de-clined to define the precise parameters of a prisoner's constitu-tional right to privacy. *See generally Harris,* 941 F.2d at 1513 n. 26;" and further stating: "Although we continue to approach the scope of the privacy right on a case-by-case basis, we now recognize that prisoners retain a constitutional right to bodily

14

privacy").[7]

Research reveals that, in the prison context, the Eleventh Circuit has in one case addressed the question of disclosure of inmates' private medical information to others. That was the opinion in Harris v. Thigpen, 941 F.2d 1495 (11 Cir. 1991), an action in which the Court found that the Alabama Department of Corrections' involuntary placement of HIV positive inmates into special HIV dormitories necessarily involved non-consensual disclosure of inmates' seropositive status, but held that the DOC blanket policy of segregating the inmates did not constitute a violation of their retained privacy right because any such right was subject to limitation, and was outweighed by legitimate penological interests of the DOC in determining how best to treat and control the spread of a communicable disease.[8]

In Harris v. Thigpen, when conducting the Turner analysis by which it reached the conclusion that valid penological interests outweighed the infringement on any privacy right the inmates might have in non-disclosure of their HIV status, the Eleventh Circuit discussed various factors which led the Court to conclude that a privacy right had been implicated. The Court noted that the publicly visible segregation of the seropositive inmates in special HIV dormitories meant that the inmates' HIV status was disclosed not only to other inmates, but would be disclosed to members of the inmates' families, and to outside visitors to the prison who are members of the general community -- which could possibly result in family abandonment, harassment or psychological pressures inside the prison, or discrimination outside the prison walls.

---

[7] In Fortner, the Eleventh Circuit, extended prisoners' privacy rights to include bodily privacy, noting that "most people have a 'special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating.'" Id. at 1030 (quoting, Lee v. Downs, 641 F.2d 1117, 1119 (4 Cir. 1981)), and collecting cases from the Second and Ninth Circuits [citations omitted]).

[8] For consideration of a separate Rehabilitation Act claim, the Harris case was remanded, in part. See Onishea v. Hopper, 126 F.3d 1323 (11 Cir. 1997).

15

While the decision by the appellate court in <u>Harris v. Thigpen</u> was concerned generally with inmates' retained privacy rights, and protection of inmates' medical information, the Eleventh Circuit in <u>Harris</u> described the nature and scope of inmates' right to privacy to be "ill-defined," and it continues to be so. <u>Harris</u>, decided some sixteen years ago, was a case of first impression in the Eleventh Circuit on the privacy issue which was presented to the Court, and the number of privacy cases decided by the Eleventh Circuit since <u>Harris</u> are few. The facts of <u>Harris</u> are different from those in this case, and they are in fact so very different that it cannot be said that the 1991 decision in <u>Harris</u> is controlling in this case.

<u>Harris</u> involved a segregation of inmates, tantamount to a public announcement of the inmates' HIV-positive status. The Court, assuming that the inmates enjoyed a privacy interest in non-disclosure to the public of that information, applied a <u>Turner</u> analysis, and determined that any such retained privacy right was outweighed by legitimate penological interests. This was despite the potential that the inmates might possibly suffer psychological pressure, embarrassment, harassment, rejection, or discrimination due to the involuntary disclosure of the medical information to non-medical persons, over which they had no control.

Even if, *arguendo*, it were reasonable for a case with facts such as <u>Harris v. Thigpen</u> to be construed so broadly as to be controlling in a case with a fact scenario like that of this matter, research reveals no such case decided by the Eleventh Circuit.

In sum, it cannot be said that there existed clearly established law at the time of the alleged deprivation in this case (on or about December 13, 1995), based on state, Eleventh Circuit, or United States Supreme Court decisions, which would have put Deputy West or any like situated government actor on notice that her actions [allegedly commenting/disclosing to other inmates that plaintiff Burgest was HIV positive] would constitute a violation of federal law under the circumstances.

Absent a violation of clearly established law, defendant West is entitled to summary judgment, based upon qualified immunity.

### III. CONCLUSION

It is therefore recommended, for the above-stated reasons, that: 1) defendant West's motion for summary judgment (DE# 57) be granted as to all claims; 2) this case be closed; and 3) all pending motions not otherwise ruled upon by separate Order be dismissed, as moot.

Objections to this report may be filed with the District Judge within ten days of receipt of a copy of the report.

Dated: December 17th 2007.

_____
UNITED STATES MAGISTRATE JUDGE

cc:  Earl Burgest, Pro Se
     Reg# 53598-004
     FCI Jesup
     2680 U.S. Highway 301 South
     Jesup, GA 31599

     Gregg Alan Toomey, Esquire
     Bunnell, Woulfe, Kirschbaum,
          Keller, McIntyre & Gregorie, P.A.
     100 SE 3rd Avenue, Suite 900
     Fort Lauderdale, FL 33394

     The Honorable James I. Cohn,
     United States District Judge